UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 07-CR-0116-CVE |
| ) | |
| MARC ANTHONY JIMENEZ, ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Before the Court is Defendant's Motion to Suppress (Dkt. # 12). Defendant Marc Anthony Jimenez ("Jimenez") is charged in the Indictment (Dkt. # 2) with possession of a shotgun with no serial number, having a barrel of less than 18 inches in length, which was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871. He seeks to suppress evidence obtained on May 22, 2007. The Court held a suppression hearing on September 5, 2007. Tulsa Police Officer David Shelby ("Shelby") testified at that hearing. The Court admitted and reviewed evidence from both plaintiff and defendant. For the reasons set forth below, the Court finds that the motion to suppress should be denied.

**I.**

On May 22, 2007, at approximately 10:19 p.m., a man who identified himself as "James" placed a 911 call to the Tulsa Police Department ("TPD"). Dkt. # 14-2, at 1. According to the caller, two "Mexican[] or Iranian[]" males were "throwing up gang signs" and "looking crazy at people" outside the McDonalds restaurant at 1701 E. 1st Street. Id. No altercation had taken place at that time. Id. The caller reported, however, that one of the suspects, who was wearing a gray shirt and boot-cut blue jeans, "looked like [he] had a pistol in his pants." Id. The caller described the

suspects' vehicle as a "newer," shiny blue, four-door car. Id. When asked if he preferred to remain anonymous, the caller responded, "Uh, it doesn't matter ma'am. It's just, you know, somebody needs to check [the McDonalds] out." Id. at 2. The person answering the 911 call did not request the caller's phone number during this brief exchange. See id. Nonetheless, TPD had record of the caller's phone number in its communications log. See Dkt. #14-3.

After the 911 call ended, dispatch called several officers and directed them to the McDonalds restaurant. The officers recognized this location as a high-crime area. Dispatch radioed to the officers the description of the suspects, their vehicle, and their reported behavior to the officers. The first officer arrived at the restaurant parking lot in approximately a minute and a half after the call. See id. at 1. Shelby, the second arriving officer, followed within a matter of seconds. See id.

At the suppression hearing, Shelby stated that as he approached the scene he encountered a "newer-looking," 1998 blue Buick Century, with a shiny exterior. The vehicle contained two male occupants: defendant and a driver. Shelby also testified that he could not discern whether the occupants were of Middle-Eastern or Latino descent. He could, however, see that "at least one" occupant wore a "light-colored or gray" shirt. Shelby further attested that the occupants intently and unnaturally stared at him as he passed in his patrol car. Given Shelby's extensive training and his more than nineteen years of experience, Shelby feared the development of a potentially dangerous threat to both public and TPD safety. The McDonalds had patrons, whose well-being could be jeopardized. Based on the dispatch information, Shelby believed that the suspects could be armed gang members who were loitering in an admittedly high-crime area. Moreover, Shelby and his TPD

2

colleagues knew of the significant correlation between gang members and loaded guns,[1] and the suspects' questionable demeanor furthered their suspicions.

Consequently, the officers performed a "felony take-down" or "high risk car stop." See Dkt. # 14-5. The officers surrounded the suspects' vehicle with guns drawn, cleared the occupants from the car, and then conducted a protective sweep. Shelby saw in plain view the barrel and forestock of a loaded, sawed-off shotgun on the passenger's side floorboard. See id. Upon further inspection, TPD discovered an unloaded .22 caliber pistol under the driver's seat. See Dkt. # 14-4, at 2.

**II.**

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). In balancing these interests, the Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996). Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. Novitsky, 491 F.3d at 1253.

---

[1] At the suppression hearing, Shelby reiterated that gang members often carry loaded guns and that gang-related shootings are not uncommon in the vicinity of the McDonalds.

In addition, "officers may effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the <u>public</u> and/or the individual.'" <u>Id.</u> at 1253 (quoting <u>King</u>, 990 F.2d at 1560) (emphasis added).

As a preliminary matter, the Court must determine whether the stop at issue is properly characterized as an investigative detention or whether the officers acted pursuant to their community caretaking function. The United States argues that the officers initiated a noninvestagatory stop in furtherance of their community caretaking duty to protect the public. Alternatively, the United States maintains that even if the stop qualifies as investigatory, the officers' actions were limited in scope and duration and supported by reasonable suspicion of criminal activity. The United States' community caretaking argument is addressed first.

The Supreme Court has held that "police officers are not only permitted, but <u>expected</u>, to exercise . . . 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" <u>King</u>, 90 F.3d at 1560 (quoting <u>Cady v. Dombrowski</u>, 413 U.S. 433 (1973)) (emphasis added). In exercising this noninvestigatory function, a police officer may have occasion to seize a person for Fourth Amendment purposes. <u>Id.</u> Consequently, the community caretaking function incorporates the "<u>Terry</u> stop" analysis, namely, the "officer's action must be 'justified at its inception,'" based on reasonable, articulable facts, and "'reasonably related in scope to the circumstances which justified the interference.'" <u>Id.</u> at 1557 (quoting <u>Terry</u>, 392 U.S. at 21); <u>see</u> <u>Novitsky</u>, 491 F.3d at 1253 (holding that the reasonableness of a noninvestigatory detention depends on whether the detention satisfies the <u>Terry</u> requirements). In sum, the community caretaking function differs only in that it

bases reasonable, articulable suspicion on a threat to individual and/or public safety.[2] King, 990 F.2d at 1560; see Novitsky, 491 F.3d at 1253.

Here, TPD detained defendant not to investigate criminal activity, but to effectuate a proper response to reported gang-related behavior. As in King, Shelby's high risk stop of defendant's vehicle was based on reasonable, articulable facts that defendant posed a danger to both public and TPD safety. King, 990 F.2d at 1561. Dispatch had reported to the officers that the suspects: (1) had at least one pistol; (2) possibly belonged to a gang; (3) exhibited potentially aggressive behavior; (4) were located in a high-crime area; and (5) were outside a busy, fast-food restaurant, known for catering to families with young children. Yet unlike the police encounter in King, TPD's actions were reasonably related in scope to the justification for the high risk stop. See id. at 1562-63. Shelby and his TPD colleagues did not perform the high risk stop out of pure concern for their own safety.[3] They performed the stop because they had a duty to protect the public from potential gang

---

[2]  One Tenth Circuit opinion has also included an additional element in the community caretaking analysis: the government's interest must outweigh the individual's interest in being free from arbitrary governmental interference. United States v. Garner, 416 F.3d 1208, 1213 (10th Cir. 2005). This Court does not deem the "balancing of interests" a separate prong, however, as this issue is already incorporated in the Terry analysis. See King, 990 F.2d at 1562-63.

[3]  Although concern for officer safety does justify the detention and removal of suspects from a vehicle, it does not excuse an intrusion that exceeds the scope of the justification. King, 990 F.2d at 1562. King found a high risk stop to be highly intrusive. See id. at 1563, 1563 n.6. Although officers are not required to use the "least intrusive means" in the course of detention, an officer enforcing his or her community caretaking duties must resort first to"less intrusive means," if appropriate, before resorting to more obstructive measures. Id.; see Novitsky, 491 F.3d at 1254 ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." (emphasis added)). The Court acknowledges that Shelby and his TPD colleagues forwent less intrusive measures before resorting to the high risk stop. As discussed above, however, this fact does not affect the ultimate
(continued...)

violence under the community caretaking function. See United States v. Garcia, 459 F.3d 1059 (10th Cir. 2006) (noting that gang activity is a factor supporting an inference of danger and violence). The present case is further distinguishable from King in that Oklahoma and federal law proscribe the carrying of a sawed-off shotgun.[4] 26 U.S.C. §§ 5841, 5845(a)(1), 5861(d) (forbidding the knowing possession of an unregistered shotgun with no serial number, having a barrel of less than 18 inches in length); Okla. Stat., tit. 21 § 1289.18 ("Every person who has in his possession or under his immediate control a sawed-off shotgun or a sawed-off rifle, whether concealed or not, shall upon conviction be guilty of a felony for the possession of such device . . . ."). Oklahoma law also prohibits the transporting of a loaded gun in a motor vehicle. Okla. Stat., tit. 21, §§ 1289.7 (prohibiting the transport of a rifle, shotgun, or pistol in a motor vehicle unless the weapon is open and unloaded, properly stored in a carrying case on a mounted gun rack in an exterior locked compartment or trunk of the vehicle), 1289.13 ("Except as otherwise provided by the provisions of

---

[3]   (...continued)
conclusion. The officers primarily sought to protect the safety of the McDonalds' patrons and other bystanders in performing the high risk stop. See Dombrowski, 413 U.S. at 447 ("The fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable.").

While the Court also gives credence to defendant's argument that a high risk stop may create a greater danger to the public than a more limited detention, the Court adheres to the principle that the courts should not "indulge in unrealistic second-guessing of police officers in determining whether a seizure was reasonably related in scope to its justification." King, 990 F.2d at 1563 (internal quotation marks and citation omitted).

[4]   In King, the officer observed a loaded pistol in plain view on the driver's seat. Id. at 1555. The Tenth Circuit noted that New Mexico law permitted motorists to carry loaded guns in their vehicles. Id. Notwithstanding this fact, however, the court expressed no opinion on whether an officer's observation of an apparently loaded pistol on the driver's seat would support a reasonable, articulable suspicion of criminal activity. Id. at 1556. Here, the Court mentions this distinction merely for the sake of completeness and recognizes that this fact does not impact the analysis.

the Oklahoma Self-Defense Act . . . or another provision of law . . . , it shall be unlawful to transport a loaded pistol, rifle, or shotgun in a landborne motor vehicle over a public highway or roadway.").

Under these narrow circumstances, the government's interest in protecting the community outweighs the individual's interest in being free from arbitrary governmental intrusion.[5]  See id. at 1560-61. The Court finds, therefore, that TPD's detention of defendant qualifies as a reasonable exercise of the officers' community caretaking function, regardless of any suspicion of criminal activity.

### III.

In the alternative, the Court finds that the stop was a valid investigatory stop based on TPD's reasonable suspicion that defendant was engaging in criminal activity. Defendant argues that the 911 call was not sufficiently reliable. Alternatively, he maintains that even if the call was sufficiently reliable, the officers did not have reasonable suspicion to conduct an investigative detention pursuant to Terry. See 392 U.S. at 21. Hence, defendant argues that the fruits of the search – namely, the loaded shotgun – should be excluded.

"A seizure by means of an investigative detention 'is constitutional only if supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam). An officer who "stops" and detains a person

---

[5]  The Court acknowledges that a high risk stop qualifies as more than a "de minimus" governmental intrusion on defendant's liberty interests. See King, 990 F.2d at 1561. The analysis must focus, however, on "whether the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." Id. at 1562. Shelby and his TPD colleagues came to the scene because of a 911 call reporting possible gang-related activity. Possible gang-related activity is wholly distinguishable from the potential traffic hazard at issue in King. See id. at 1561-63. Thus, the more pressing community need dictated a greater governmental intrusion.

"must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. When evaluating the validity of a Terry stop, "the totality of the circumstances – the whole picture – must be taken into account." United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)); see United States v. Johnson, 364 F.3d 1185, 1190 (10th Cir. 2004)).

### Sufficient Indicia of Reliability

The Court must initially determine whether the 911 call qualifies as anonymous, as this characterization greatly affects the reliability analysis. The Supreme Court in Florida v. J.L., 529 U.S. 266 (2000), held that an anonymous 911 call must be corroborated to create sufficient indicia of reliability. There, an anonymous caller reported to the police that a young, African-American male was standing at a bus stop, carrying a gun, and wearing a plaid shirt. Id. at 268. There was no audio recording of the tip and nothing was known about the informant. Id. Police officers responded to the call, reported to the bus stop, and observed three black males. Id. One of the men happened to be wearing a plaid shirt. Id.

The facts of this case, however, do not present an anonymous tipster. TPD received a nonanonymous 911 call from a man named "James" that two men were: (1) "throwing up gang signs," (2) "looking crazy at people," (3) potentially carrying a pistol, and (4) loitering outside a McDonalds restaurant in a high-crime neighborhood at 10:20 p.m. Although admittedly not the most detailed report, the caller likewise described the two men's vehicle, their physical appearance, their behavior, and their precise location. Further, TPD also had record of the caller's phone number

in its call log.[6]  To the extent that the caller's allegations turned out to be fabricated and were meant to harass defendant or others, the caller could have been held responsible pursuant to Oklahoma law. See, e.g., United States v. Jenkins, 313 F.3d 549, 554 (10th Cir. 2002) (holding that police ability to determine caller's identity provides a disincentive for making false reports and that courts should be mindful of this fact).  Therefore, the Court finds that the 911 call to TPD is quite distinguishable from the anonymous tip in J.L.

The Court must decide whether this nonanonymous 911 call otherwise qualifies as sufficiently reliable.  Defendant points to United States v. Jones, 998 F.2d 883 (10th Cir. 1993), to support his argument that the officers did not have reasonable suspicion based on the caller's general description of the suspects and vehicle.  There, the police received a report that two African-American men with a gun had forcefully pounded on the door of an apartment.  The owner of the apartment saw the men leave the apartment area in a black Mercedes.  Approximately a mile and a half from the apartment, the officers stopped a black Mercedes.  Two black men, a woman, and a child were in the vehicle.  The Tenth Circuit found that the stop was not supported by reasonable suspicion required by the Fourth Amendment.  The court noted that the stop occurred in a major city on a weekday afternoon.  It reasoned, "the officers singled out this car, out of all the cars in the area, for a massive intrusion based solely on the color and manufacturer of the car, and the fact that it

---

[6]  In Justice Kennedy's concurrence in J.L., he noted: "Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to make false reports to the police, . . . and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." 529 U.S. at 276 (Kennedy, J., concurring).

9

contained two black men." Id. at 885.  The court continued, "[a]bsent a strong showing, on the record and based on objective statistics, that the sight of two African-Americans in a black Mercedes was a highly unusual event, we cannot sanction the officers' claim that this flimsy evidence provided them with a reasonable suspicion that they had found the car that fled the disturbance." Id.  It found that the stop was illegal based on the "fatal weakness of the description of this vehicle and its occupants." Id. at 885-86.

The United States responds, however, by pointing to Johnson, wherein the Tenth Circuit held that a nonanonymous tip, which included a fairly detailed description of the suspects and situation, may be "sufficiently reliable to be analyzed as part of the totality of the circumstances." 364 F.3d at 1190.  In Johnson, the 911 caller reported an apparently unarmed, middle-aged African-American male forcing a young Caucasian female to walk down a street in a high-crime area known for prostitution and drugs. Id. at 1187.  The unnamed caller volunteered his phone number and stayed on the line with the 911 operator for approximately eight minutes while he described what he was seeing. Id. at 1191.  His detailed descriptions of the young girl and middle-aged man, along with their exact location, were confirmed by the responding officer. Id.  The officer did not, however, observe any forceful or otherwise illicit behavior. Id. at 1187-88.  The court concluded that the 911 call qualified as sufficiently reliable, because the police had the caller's phone number, the caller had firsthand knowledge, and the description of the suspects – together with their exact location – was confirmed by the officer. Id. at 1191; see United States v. Samuels, 493 F.3d 1187, 1193 n.8 (10th Cir. 2007) (implying that if the reliability of an informant is known, the officers do not generally need "to verify details of the tip beyond the identifying information available for observation by the general public"); Jenkins, 313 F.3d at 554; United States v. Tuter, 240 F.3d 1292,

1297-98 (10th Cir. 2001) (noting that corroborated firsthand observations can evidence sufficient indicia of reliability).

Here, the facts are substantially different from Jones and more analogous to Johnson. First, the police conducted the investigative detention at the precise location indicated by the caller. Second, the police arrived at the McDonalds within two minutes after the placement of the call. Given this short amount of time, the individuals described in the 911 call very likely remained at the location. Third, the officers' observations matched the caller's description. Shelby testified that he noticed a blue, four door vehicle, with two male Middle-Eastern or Latino occupants, one of whom wore a light-colored or gray shirt. Fourth, the caller in this case described two individuals and the Buick contained only two passengers. The Court finds that the officers had sufficient, particularized information upon which to base the stop of defendant's vehicle. See Samuels, 493 F.3d at 1193 (holding that the officers had reasonable suspicion to conduct an investigative detention when they received a tip about an African-American male in a white El Camino in a convenience store parking lot). Therefore, the Court finds that the 911 call entailed sufficient indicia of reliability.

Reasonable, Articulable Suspicion

Defendant maintains that even if the 911 call qualified as sufficiently reliable, the validity of TPD's high risk stop turns on the reasonable suspicion element. Apart from the 911 phone call, defendant argues, the officers had no reason to suspect defendant or his companion of any criminal activity.

The Tenth Circuit has held that, as long as the police have a particularized and objective basis for suspecting defendant of criminal activity, they can "initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." Johnson, 364 F.3d

at 1194. A court may find that the police had reasonable suspicion of criminal activity even if: (1) the 911 call failed to allege any criminal activity, and (2) the responding officer did not actually observe any criminal undertakings. Id. at 1191-94. Consequently, while the Court recognizes that Shelby and his TPD colleagues did not initially witness any illegal behavior, Johnson appears not to require such an observation. The TPD officers had particularized suspicions relating to the defendant. First, defendant and his vehicle matched the caller's descriptions. Second, defendant was at the exact location identified by the caller. Third, the officers arrived at the McDonalds, located in an area known for its gang-related and criminal activity, within two minutes of the call. Fourth, Shelby testified that, based on his more than nineteen years of training and experience, the vehicle occupants reacted suspiciously to his presence. When considered in totality, particularly under the Johnson framework, the facts clearly substantiate the officers' reasonable articulable suspicion.

**IV.**

To the extent defendant challenges the scope of his detention, an officer may conduct a protective frisk or sweep of the passenger compartment of a suspect's vehicle if the officer reasonably believes that the suspect might be armed and presently dangerous. See Michigan v. Long, 463 U.S. 1032, 1049 (1983) (allowing limited search of passenger compartment of lawfully stopped vehicle and seizure of any discovered weapon based on reasonable suspicion of threat to officer safety); Pennsylvania v. Mimms, 434 U.S. 106 (per curiam) (permitting officers to perform a high risk stop on suspect's vehicle during a valid detention when performed as a matter of routine safety procedure); Terry, 392 U.S. at 27, 30; United States v. Dennison, 410 F.3d 1203, 1210 (10th Cir. 2005) ("Officers can conduct a protective search of a vehicle's passenger compartment for

weapons during an investigative detention when officers have a reasonable belief that a suspect poses a danger."); United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982) (finding that officers' approach of suspect with guns drawn and pointed did not render the investigative detention unreasonable where officers believed suspect was armed and dangerous). Because the justification of a protective frisk or sweep is officer safety, the search must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. In evaluating whether the precautionary steps taken by an officer were reasonable, "the standard is objective – would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (internal quotation marks and citation omitted).

Here, the TPD officers had reasonable, articulable suspicion that defendant was armed with at least one gun. Dispatch told the officers that one of the suspects had a pistol in his pants. This information, together with the totality of the circumstances discussed above, provided a lawful reason to conduct a protective sweep to ensure officer safety. Accordingly, the Court finds that the precautionary steps of removing defendant from his vehicle and searching the passenger compartment did not render the investigatory detention unreasonable.

## V.

Once the stop was effectuated, the officers legally seized the shotgun based on the plain view doctrine. "Law enforcement authorities may seize contraband in plain view without a warrant if three conditions are met: (1) the law enforcement authorities are lawfully in a position from which they may view the object; (2) the object's incriminating character is immediately apparent; and (3)

the authorities have a lawful right of access to the object." United States v. Lang, 81 F.3d 955, 967 (10th Cir. 1996). First, as discussed above, the officers lawfully stopped the vehicle, based either on their community caretaking duties or reasonable suspicion of criminal activity. Second, the incriminating character of the object – a gun – was apparent. Third, the officers had a lawful right of access to the object via a protective sweep of the car. Therefore, upon seeing the barrel and forestock of the shotgun on the passenger's side floorboard, Shelby could lawfully seize the weapon under the plain view doctrine.

## VI.

In summary, the Court finds that the police lawfully detained defendant as part of the community caretaking function, regardless of whether Shelby and his TPD colleagues suspected criminal activity. In the alternative, the Court finds that the police conducted a lawful investigative detention based on reasonable suspicion of criminal activity. This detention was reasonable in scope and based on a reasonable belief that defendant posed a danger. Finally, the Court finds that the seizure of the shotgun was reasonable because the incriminating character of the object was apparent and in plain view.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Dkt. # 12) is hereby **denied**.

**DATED** this 10th day of September, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT